Aaron LINDH, Petitioner–Appellant,

v.

James P. MURPHY, Warden,
Respondent–Appellee.

No. 95–3608.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1996.

Reargued En Banc June 17, 1996.

Decided Sept. 12, 1996.

Keith A. Findley, Office of the State Public Defender, Madison, WI, James S. Liebman (argued), New York City, for Petitioner–Appellant.

Sally L. Wellman (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Respondent–Appellee.

Barry Levenstam, Jerold S. Solovy, Ellen R. Kordik, Charles B. Leuin, Jenner & Block, Chicago, IL, Roberta Cooper Ramo, American Bar Association, Chicago, IL, for American Bar Association, Amicus Curiae.

David E. Jarvis, Jeffrey O. Davis, Mitchell S. Moser, Quarles & Brady, Milwaukee, WI, George H. Kendall, New York City, for Nicholas J. Bua, Marvin E. Frankel, Susan Getzendanner, John H. Gibbons, A. Leon Higginbotham, Shirley M. Hufstedler, George N. Leighton, Philip W. Tone, Harold R. Tyler, Jr., Amici Curiae.

Before POSNER, Chief Judge, and CUMMINGS, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

In January 1988 Aaron Lindh marched into the City–County Building of Madison, Wisconsin, and shot three strangers for no apparent reason. Two died. Lindh pleaded guilty to carrying and using a firearm in a public building; a jury convicted him of two murders and one attempted murder. During the second phase of a bifurcated proceeding, Lindh argued that he was insane at the time of the shootings, which under Wisconsin law would alter the place of his confinement (from a prison to a prison-hospital) and entitle him to release if at some future time he should be deemed "recovered." But the jury found that Lindh did not have a mental disease when he pulled the trigger, and the judge sentenced him to life plus 35 years in prison.

Lindh's principal contention on appeal was that the judge unduly restricted his cross-examination of Dr. Leigh Roberts, a psychiatrist who interviewed him on the day of the shootings (and several times thereafter) and testified for the prosecution during the second phase of the trial. During March 1988 Roberts learned that he was under investigation for engaging in improper sexual conduct with a female patient; in May 1988 Roberts learned that the Medical Examining Board was looking into allegations made by three female patients. By the time of trial in September 1988 a criminal investigation was ongoing—conducted by the Milwaukee County District Attorney, acting as a special prosecutor after the Dane County District Attorney (whose jurisdiction includes Madison) recused himself. Lindh's attorney sought to explore the allegations made against Roberts, contending that the pending investigation would give Roberts a reason to slant his testimony in the prosecution's favor. Lindh did not argue that Roberts had entered into discussions with the prosecutor about the sexual misconduct allegations; any plea agreement or negotiations in progress would have been

subjects of cross-examination under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Instead Lindh argued that even if the Dane County prosecutor could not provide a quid pro quo by forgoing charges or reducing their severity, he might put in a good word with the Milwaukee prosecutor; and whether or not lenity was in the cards, Roberts might *believe* that he had something to gain from helping to convict Lindh, which could color his analysis and testimony. Lindh argued that both state law and the Confrontation Clause of the Sixth Amendment, applied to the states by the due process clause of the Fourteenth, entitled him to cross-examine Roberts about all potential sources of bias. See *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

The trial judge foreclosed inquiry into this subject (although he permitted extensive cross-examination on other matters), the court of appeals reversed, *State v. Lindh,* 156 Wis.2d 768, 457 N.W.2d 564 (Wis.App.1990), and the Supreme Court of Wisconsin reversed in turn, reinstating the sentences, *State v. Lindh,* 161 Wis.2d 324, 468 N.W.2d 168 (1991). The state's highest court concluded that the possibility of bias was so remote, given the appointment of a special prosecutor, and the prospect of diverting attention to the sexual encounters (a subject of no relevance to Lindh's sanity) sufficiently great, that the trial judge did not abuse the discretion he possessed under both state and federal law. Justice Abrahamson dissented on state-law grounds. 468 N.W.2d at 185–89. Lindh then commenced a collateral attack in federal court. The district court denied the petition, writing that it "agrees wholeheartedly with the analysis of" the state's Supreme Court. Lindh appealed to this court.

Fifteen days after a panel heard oral argument, the President signed the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214. Section 104 of the new statute amends 28 U.S.C. § 2254, the law under which Lindh seeks relief.

Unaffected by the 1996 Act, § 2254(a) provides that a writ of habeas corpus may issue "on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." It does not further elaborate. Federal courts exercising their authority under § 2254(a) disregarded the state courts' legal conclusions and reached independent judgments on issues presented to them. *Brown v. Allen,* 344 U.S. 443, 458, 73 S.Ct. 397, 407–08, 97 L.Ed. 469 (1953). Section 104(2) of the 1996 Act redesignates the former § 2254(d), which deals with state courts' findings of fact, as § 2254(e); § 104(3) of the 1996 Act, 110 Stat. 1219, adds a new § 2254(d) that for the first time specifies the appropriate treatment of legal determinations by state courts:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

We set this case for reargument before the full court in order to decide whether the new provision applies to pending cases and, if it does, how it affects them. We invited and received supplemental briefs from the parties, and we have had the benefit of briefs from the American Bar Association and a group of former federal judges as *amici curiae.*

**I**

■ *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), lays out a sequence of issues. First we must decide whether Congress has decided to which cases a new law applies; if it has, the only task is to follow the statute. If Congress has not provided one way or the other, we must apply the law in force at the time of decision—which is to say, the new § 2254(d)—unless "the new provision attaches new legal consequences to events completed before its enactment." 511 U.S. at ——, 114 S.Ct. at 1499. But what is a "new legal consequence"? *Landgraf* says that not every change in outcome counts; it matters whether the party adversely affected by the change has legitimate reliance interests in the operation of the former law.

**A**

■ Has Congress answered the question at hand? Not directly. Section 104 of the 1996 Act lacks an effective-date provision. Lindh contends that Congress addressed the subject indirectly, by providing that the new Chapter 154 of Title 28 (28 U.S.C. §§ 2261–66), captioned Special Habeas Corpus Procedures in Capital Cases and contained in § 107(a) of the 1996 Act, applies "to cases pending on or after the date of enactment of this Act." Section 107(c), 110 Stat. 1226. This establishes, Lindh submits, that §§ 101 to 106 of the statute do *not* apply to pending cases.

"Establishes" is too strong a word. Sections 101 to 106 amend Chapter 153 of Title 28. Nothing in the 1996 Act provides one way or another for the temporal extent of the changes. Do they govern collateral attacks arising out of crimes committed after April 24, 1996? Convictions after that date? Appellate decisions after that date? Collateral attacks filed after that date? The statute is silent. Congress addressed those issues for Chapter 154, but not Chapter 153. There is at most a negative implication. Should we draw it? A competing inference is that Congress could not agree on an effective-date provision for the amendments to Chapter 153, leaving the subject to judicial resolution. Perhaps instead Congress overlooked the subject when drafting §§ 101–106 (the changes to Chapter 153 and the new Chapter 154 originated in different Houses of Congress at different times)—or recognized its importance but thought the answer so clear that express provision was unnecessary. Which understanding is superior?

Potential negative implications of effective-date provisions have been urged before, most recently in *Landgraf*. The Civil Rights Act of 1991 provides that "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." The Court held that this language "does not even arguably suggest that [the Act] has any application to *conduct* that occurred at an earlier date." 511 U.S. at ——, 114 S.Ct. at 1493 (emphasis added). Two other provisions of the 1991 Act are more explicit. One says that the statute does not apply to a particular ongoing case; the other says that the extension of the civil rights laws to overseas employers "shall not apply with respect to conduct occurring before the date of the enactment of this Act." Landgraf argued that these two anti-retroactivity provisions established that the rest of the 1991 Act applied to conduct preceding its enactment. Otherwise the two anti-retroactivity provisions would be irrelevant, and courts try to interpret laws to avoid both irrelevance and redundancy. *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1494. The Court conceded this but held nonetheless that the 1991 Act is effectively silent on the question. *Id.* at ——–——, 114 S.Ct. at 1494–96. It was unwilling to draw a negative implication from two provisions that may have been inserted just to make double sure. Although "a majority of the 1991 Congress [may have] favored retroactive application, even the will of the majority does not become law unless it follows the path charted in Article I, § 7, cl. 2 of the Constitution" (511 U.S. at ——, 114 S.Ct. at 1496)—that is, unless it yields a text agreed on by both Houses and signed by the President.

Just so with the 1996 Act. And the argument by negative implication is weaker for the 1996 Act than for the 1991 Act. The Supreme Court's holding in *Landgraf* made two sections of the statute irrelevant. Nothing we could hold, one way or the other, about §§ 101–106 could deprive § 107(c) of independent meaning. True enough, 28 U.S.C. § 2264(b), in Chapter 154, refers to § 2254(d), so § 107(c) requires the application of the amended § 2254(d) to capital cases within the scope of Chapter 154. But we think that Lindh misunderstands Chapter 154 when contending that § 2264(b) has "no function other than to cause certain of the otherwise inapplicable Chapter 153 revisions to apply retroactively" (Supp. Reply Br. 3). Section 2264(a) provides that, when Chapter 154 applies, a court shall consider only "a claim or claims that have been raised and decided on the merits in the State courts" unless failure to raise a claim was caused by one of three identified circumstances. Section 2264(b) adds: "Following review subject to subsections (a), (d), and (e) of section 2254, the court shall rule on the claims properly before it." Why only "subsections (a), (d), and (e) of section 2254"? Surely not because these are to be retroactive, while subsections (b), (c), (f), (g), (h), and (i) are not. If as Lindh believes the only reason to include § 2254(d) in § 2264(b) is to apply it to pending cases, then this must also be the sole reason for referring to § 2254(a)—but § 2254(a) is not amended by the 1996 Act, while many subsections omitted from the list in § 2264(b) were amended or added by the new statute.

Section 2264(b) conveys its meaning only when read together with § 2264(a). Subsections (b) and (c) of § 2254 have been omitted from the list because § 2264(a) *replaces* their rule with one more favorable to the states. Section 2254(b) and (c) codify the exhaustion requirement, which § 2264(a) displaces for Chapter 154 cases. The remaining subsections of § 2254 likewise don't fit the Chapter 154 scheme. For example, § 2254(i), added by the 1996 Act, says that "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 110 Stat. 1219. Chapter 154 addresses this question directly in the new 28 U.S.C. § 2261(e), 110 Stat. 1222, making incorporation of § 2254(i) inapt. Section 2264(b) tells us not "when," but "which." Lindh's argument therefore misses the mark: this section neither addresses any other section's temporal effectiveness nor is made irrelevant by applying § 2254(d) to pending cases.

Chapter 154 comprises many rules that Congress evidently wanted to apply forthwith no matter what the courts made of

§§ 101–106. For example, the new 28 U.S.C. § 2262(a) provides for automatic stays of execution during initial collateral attacks covered by Chapter 154. Prisoners on death row received stays on April 24, 1996, even if courts had denied stays under prior law. Having blocked executions while litigation continues, Congress curtailed the time federal courts may take to act—for example, a court of appeals must decide a capital appeal within 120 days after the filing of the reply brief. 28 U.S.C. § 2266(c)(1)(A). Section 107(c) applies that limit to pending capital cases, a step that serves quite a different function from a decision one way or the other about the application of § 2254(d) to noncapital cases. Congress obviously wanted to *ensure* that both the stays of execution and the time limits—provisions of Chapter 154 without counterparts in Chapter 153—extended to as many cases as possible. Nothing about that decision has any implications for Chapter 153. We conclude that § 107(c) does not govern the question at hand. Sections 101–106 lack an effective-date provision. We must decide what to do when the legislation is silent.

**B**

*Landgraf* reiterates two long-established rules that govern when the legislature is silent: first, courts normally apply the law in force at the time of decision; second, the court does not use the new law if application would be "retroactive." Each side appeals to one of these propositions. Wisconsin contends that § 2254(d) is today's rule of decision and should be applied. Lindh rejoins that § 2254(d) would be "retroactive" to the extent it reduces his chance of prevailing. He also contends that he is entitled to a writ of habeas corpus whether or not § 2254(d) applies, but he uses the possibility of an adverse effect as the definition of retroactivity. As a definition, it will not do—for it would obliterate the first rule, turning it into something like "a court applies the law in force at the time of its decision whenever it is the same as the law in force all along." *Landgraf* was explicit that "[e]ven uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct". 511 U.S. at —— n. 24, 114 S.Ct. at

1499 n. 24; see also *id.* at ———–——, 114 S.Ct. at 1501–04.

"A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based on prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1499 (citation and footnote omitted). Section 2254(d) does not attach new legal consequences to the filing of petitions for habeas corpus, although some other parts of the 1996 Act may do this. We take it that under *Landgraf* a certificate of probable cause to appeal issued before April 24, 1996, authorizes an appeal, although after April 24 appeal depends on a "certificate of appealability" under § 102 of the 1996 Act (amending 28 U.S.C. § 2253(c)), which not only changes the name but also requires the court to identify the appealable issue. Similarly, a second or successive petition already pending on April 24 does not require prior approval of the court of appeals under § 106 (amending 28 U.S.C. § 2244(b)), see *Williams v. Calderon,* 83 F.3d 281, 285–86 (9th Cir.1996), although the application of the substantive standards in the new § 2244(b) to determine who is eligible for relief is a more difficult question, which the court addresses separately today in *Burris v. Parke,* 95 F.3d 465 (7th Cir.1996).

For a provision such as § 2254(d), which affects the relation between federal and state courts, rather than regulating the details of litigation, the date on which the petition was filed can't be any more important than the date on which the suits were filed in *Landgraf* and *Mojica v. Gannett Co.,* 7 F.3d 552 (7th Cir.1993) (en banc). In *Landgraf* the Court asked whether the Civil Rights Act of 1991 could be applied to employment decisions that preceded the statute. A lawsuit concerning 1990 conduct is governed by 1990 law, no matter when the suit began, *Landgraf* held (as we had held in *Mojica,* 7 F.3d at 558–59). See also *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). The parallel ques-

tion is whether the 1996 Act may be applied when the crime or state court decision preceded April 24, 1996.

Understandably, Lindh does not argue that, when deciding whether to commit a crime (and, if so, which one), he relied on the availability of the version of § 2254 that was on the books in 1988. Under the Ex Post Facto clauses people charged with crime have powerful, and enforceable, expectations about the legal rules that apply to their conduct. But the 1996 Act does not change any of the rules defining or penalizing crime. Moreover, having lost in the state's judicial system before the amendment, Lindh cannot successfully argue that the change of law affected the judicial process. By any standards, the former version of § 2254 was more favorable to prisoners than the current one, and the prospect of more intensive review by federal courts may have made state courts more attentive to claims under federal law. Lindh wants us to cast a darker light on state judges—to assume that the prospect of plenary federal review made them inattentive to federal rights, because then they could appear tough on crime (to improve reelection prospects) while knowing that the people they confine in prison would eventually be let go. He does not offer any empirical support for believing that state judges wrongfully imprison people to further their own careers, and in Wisconsin judges who proclaim willingness to give defendants extra rights have had no difficulty being retained. See Shirley S. Abrahamson, *The Emergence of State Constitutional Law,* 63 Tex.L.Rev. 1141 (1985). It would not be appropriate to presume that the Justices of the Supreme Court of Wisconsin treated Lindh poorly because they anticipated independent federal review.

■ Section 2254(d) does not regulate primary conduct. Instead it makes the initial judgment more stable. Do prisoners have legitimate expectations about the scope of collateral review? This is a question the Supreme Court addressed in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). A prisoner called his lawyer ineffective for failing to take full advantage of an appellate opinion that was overruled after the prisoner commenced his collateral attack. The Supreme Court held that the prisoner could not rely on the overruled decision (or obtain relief because his lawyer failed to do so, when he could), even though its disappearance reversed the outcome of his case. The Court's discussion is worth quoting:

> The dissent contends that this holding is inconsistent with the retroactivity rule announced in *Teague v. Lane,* 489 U.S. 288, 310 [109 S.Ct. 1060, 1075, 103 L.Ed.2d 334] (1989), but we think otherwise. *Teague* stands for the proposition that new constitutional rules of criminal procedure will not be announced or applied on collateral review. As the dissent acknowledges, this retroactivity rule was motivated by a respect for the States' strong interest in the finality of criminal convictions, and the recognition that a State should not be penalized for relying on "the constitutional standards that prevailed at the time the original proceedings took place." "The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar,* 494 U.S. 407, 414 [110 S.Ct. 1212, 1217, 108 L.Ed.2d 347] (1990).
>
> A federal habeas petitioner has no interest in the finality of the state court judgment under which he is incarcerated: indeed, the very purpose of his habeas petition is to overturn that judgment. Nor does such a petitioner ordinarily have any claim of reliance on past judicial precedent as a basis for his actions that corresponds to the State's interest described in the quotation from *Butler, supra.* The result of these differences is that the State will benefit from our *Teague* decision in some federal habeas cases, while the habeas petitioner will not. This result is not, as the dissent would have it, a "windfall" for the State, but instead is a perfectly logical limitation of *Teague* to the circumstances which gave rise to it. *Cessante ratione legis, cessat et ipsa lex.*

506 U.S. at 372–73, 113 S.Ct. at 844 (citations omitted). In other words, legal changes that

reduce the willingness of federal courts to set aside judgments presumptively apply to existing judgments.

This is the historical practice. The Supreme Court consistently applies statutory changes in the law of collateral attack to pending cases, and perforce to newly filed cases that seek relief from judgments entered before the statute's enactment. In *Felker v. Turpin*, —— U.S. ——, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), the Court decided a case under the 1996 Act's standards, even though the conviction preceded the amendments. (The petition for habeas corpus in *Felker* was filed after April 24, 1996, but we have already explained why the date of the petition cannot be dispositive.) Thirty years ago Congress made extensive amendments to Chapter 153, which the Court applied to cases under review without so much as remarking on the date of enactment. *Smith v. Yeager*, 393 U.S. 122, 124–25, 89 S.Ct. 277, 278–79, 21 L.Ed.2d 246 (1968); *Carafas v. LaVallee*, 391 U.S. 234, 239, 88 S.Ct. 1556, 1560, 20 L.Ed.2d 554 (1968). Earlier amendments to the rules of collateral attack likewise were brought to bear in pending cases. *Gusik v. Schilder*, 340 U.S. 128, 131–33 & n. 4, 71 S.Ct. 149, 151–52 & n. 4, 95 L.Ed. 146 (1950), implements the exhaustion requirement introduced by the 1948 amendment to § 2254. Accord, *Darr v. Burford*, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950).

■ The language of the amendments likewise implies immediate application. Recall that § 2254(d) does not empower a court to issue the writ. Instead it *forbids* issuance of the writ—the application "shall not be granted unless" certain conditions have been met. The prohibition is prospective: a court must not issue the writ tomorrow, unless .... The difference between an authorization and a prohibition is one we must respect. See *Ivey v. Harney*, 47 F.3d 181 (7th Cir.1995). It is the sort of difference that the Supreme Court has relied on when holding that changes in the law affecting judicial ability to supply prospective relief govern pending cases. E.g., *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969); *American Steel Foundries v. Tri–City Cen-*

*tral Trades Council*, 257 U.S. 184, 201–02, 42 S.Ct. 72, 75–76, 66 L.Ed. 189 (1921); *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 464, 41 S.Ct. 172, 175, 65 L.Ed. 349 (1921), all discussed favorably in *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1501. Current law normally governs when statutes "speak to the power of the court rather than to the rights or obligations of the parties," *Republic National Bank of Miami v. United States*, 506 U.S. 80, 99–100, 113 S.Ct. 554, 565, 121 L.Ed.2d 474 (1992) (Thomas, J., concurring) (quoted with approval in *Landgraf*, 511 U.S. at ——, ——, 114 S.Ct. at 1499, 1502). We do not suggest that § 2254(d) reduces the power of the court in the sense of subject-matter jurisdiction, which survives intact in 28 U.S.C. § 2241; a state may waive the benefits of § 2254(d), although other provisions of the 1996 Act, such as the revised exhaustion requirement in § 2254(b), suggest that counsel's inattention to the niceties of federal practice does not forfeit the benefits the law bestows on the state as an entity. See also *Eaglin v. Welborn*, 57 F.3d 496, 498–99 (7th Cir.1995) (en banc) (holding that a court may decide a case on the basis of *Teague* even if the state's lawyers overlooked that possibility). Our point, rather, is that the amended § 2254(d) is designed to curtail collateral review and augment the finality of judgments, which strongly implies application to existing judgments.

### C

Lindh and the State of Wisconsin litigated in the state's forums the constitutional claim he presents to us. To leave the ensuing judgment in force—and to leave all of the rules governing primary conduct intact—is not "retroactive" in the sense *Landgraf* uses that term, and the amended § 2254(d) is therefore presumptively applicable. We respectfully disagree with the contrary conclusions of *Edens v. Hannigan*, 87 F.3d 1109, 1111 n. 1 (10th Cir.1996), and *Boria v. Keane*, 90 F.3d 36 (2d Cir.1996).

■ There remains a possibility that application of the 1996 Act could "attach new legal consequences" to events *other* than the crime and the state's legal processes and judgment. Consider, for example, how the filing dead-

line in § 101 of the 1996 Act applies to existing judgments. Under the new statute, 28 U.S.C. § 2244(d), a petitioner has only one year from the completion of direct review to commence a collateral attack; there was no corresponding limit in prior law, although Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts established an amorphous standard linked to prejudice to the state. A prisoner could wait a decade without transgressing Rule 9(a). See *Lonchar v. Thomas,* —— U.S. ——, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996). Lindh got his collateral attack under way less than a year after the Supreme Court of Wisconsin decided his case. But suppose he had waited two years, filing in 1993 rather than 1992. Would we now apply § 2244(d) and dismiss the petition? Not at all. A prisoner's decision to defer filing—perhaps while doing legal research, or while waiting for the Supreme Court to decide a case that could influence the selection of issues—is the sort of event to which the amended statute would "attach new legal consequences." Courts treat a reduction in the statute of limitations as a rule for new cases only. See *Landgraf,* 511 U.S. at —— n. 29, 114 S.Ct. at 1502 n. 29. And although no decision of the Supreme Court addresses the question directly, we do not doubt that the Court would give a plaintiff who files after the enactment a reasonable post-amendment time to get litigation underway. A new statute is unlike a judicial construction of an existing statute, which after *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), governs all pending cases. Section 2244(d) is short enough that the "reasonable time" after April 24, 1996, and the one-year statutory period coalesce; reliance interests lead us to conclude that no collateral attack filed by April 23, 1997, may be dismissed under § 2244(d) and the parallel provision added to 28 U.S.C. § 2255 by § 105 of the 1996 Act.

■ But Lindh lacks any reliance interest nearly that strong. His able counsel identifies only two steps he took (rather, omitted) in supposed reliance on the prior state of the law: he did not ask the Supreme Court of the United States to review the decision of the Supreme Court of Wisconsin, and he did not file a collateral attack in state court. Let us start with the omission of a petition for certiorari. Lindh observes that the Supreme Court, engaged in direct review under 28 U.S.C. § 1257, would not have been (and still is not) affected by § 2254(d). That is true enough, but even under the former text of § 2254 petitioners faced obstacles (such as the exhaustion requirement, the special protection of state courts' findings of fact, and the *Teague* doctrine) that did not apply on direct review under § 1257. A court exercising appellate jurisdiction has now, and had in 1991, more authority to correct errors than a court hearing a collateral attack. Defendants in state cases bypass their opportunity to seek certiorari not because they expect favorable treatment under § 2254, but because they recognize that the Supreme Court of the United States rarely grants such requests. "A petition for a writ of certiorari will be granted only for compelling reasons." S.Ct. R. 10. As a practical matter, to obtain direct review Lindh would have had to establish not only the national importance of the question at hand, but also that the decision of the Supreme Court of Wisconsin interpreted the Constitution in a way disagreeing with the interpretation of the highest court of another state, or of a United States court of appeals. S.Ct. R. 10(b). Lindh does not argue that his case presents such an abstract legal question; instead he argues that the state's courts misapplied settled law to the facts of his case. Such a contention had no prospect in 1991 of receiving an audience in the Supreme Court of the United States, and Lindh gave up nothing of value by deciding not to seek certiorari. Lightning can strike a petition for certiorari, but Lindh's would not have been a good lightning rod.

■ As for the omission of a collateral attack in state court: Wisconsin would not have entertained one, had Lindh filed it. Wisconsin does not permit an inferior court to review a decision of the state's highest court. Wis. Stat. § 974.06. A prisoner who can establish an unusual reason, such as an

intervening change of law, may wage a collateral attack in Wisconsin even after the state's Supreme Court has addressed the merits, see *State v. Escalona–Naranjo*, 185 Wis.2d 168, 517 N.W.2d 157 (1994), but Lindh does not qualify for this exception—and, if he does, the state courts remain open to him. Lindh contends that the Supreme Court of Wisconsin misunderstood one factual question: whether Roberts' privileges at the University of Wisconsin Hospital had been suspended by the time of trial. The court wrote that the record did not show such a suspension, 468 N.W.2d at 173, and Lindh says that this is wrong. If so, and if this is important, Lindh could have sought rehearing in the state court or could have introduced factual support for his position in the federal district court. He did neither, raising this contention for the first time only in supplemental briefs filed after the case had been set for rehearing en banc. Issues raised so belatedly are forfeited; we deny the motion to supplement the record. Lindh's delay cannot be attributed to the 1996 Act, as he had ample opportunity to make his version of events known under both former and current § 2254 (the amended § 2254(e)(1), 110 Stat. 1219, authorizes a petitioner to dispute a factual determination by a state court, although proof of error requires clear and convincing evidence). Once again, therefore, Lindh's litigating decisions were not affected by the difference between the versions of § 2254. The 1996 Act does not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1505. The new law therefore governs our consideration of Lindh's contentions.

#### D

▪ Almost as an afterthought, Lindh (with the support of the American Bar Association, as *amicus curiae*) asserts that *any* alteration in the scope of collateral review after a prisoner has filed a petition under § 2254 violates Art. I, § 9, cl. 2 of the Constitution: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Lindh does not cite any authority for this proposition, and we think the contention feckless. If the new § 2254(d) "suspends" the Great Writ, it does so no less for cases filed on April 25, 1996, than for cases pending on April 24. Yet to alter the standards on which writs issue is not to "suspend" the privilege of the writ. *Felker* so holds for another amendment made by the 1996 Act.

The writ known in 1789 was the pre-trial contest to the executive's power to hold a person captive, the device that prevents arbitrary detention without trial. *Ex parte Bollman & Swartwout*, 8 U.S. (4 Cranch) 75, 2 L.Ed. 554 (1807); *Ex parte McCardle*, 73 U.S. (6 Wall.) 318, 18 L.Ed. 816 (1868); *Ex parte Royall*, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886). See *McCleskey v. Zant*, 499 U.S. 467, 478, 111 S.Ct. 1454, 1461–62, 113 L.Ed.2d 517 (1991); *Schlup v. Delo*, —— U.S. ——, ——, 115 S.Ct. 851, 862, 130 L.Ed.2d 808 (1995). The power thus enshrined did not include the ability to reexamine judgments rendered by courts possessing jurisdiction. *Ex parte Kearney*, 20 U.S. (7 Wheat.) 38, 5 L.Ed. 391 (1822); see also Dallin H. Oaks, *Habeas Corpus in the States—1776–1865*, 32 U. Chi. L.Rev. 243, 244–45 (1965). Under the original practice, "a judgment of conviction rendered by a court of general criminal jurisdiction was conclusive proof that confinement was legal ... [and] prevented issuance of a writ". *United States v. Hayman*, 342 U.S. 205, 211, 72 S.Ct. 263, 268, 96 L.Ed. 232 (1952); see also *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 101, 19 L.Ed. 332 (1869).

▪ The founding-era historical evidence suggests a prevailing view that state courts were adequate fora for protecting federal rights. See Max Farrand, 1 *Records of the Federal Convention of 1787* 124–25 (1937). Based on this assumption, there was (and is) no constitutionally enshrined right to mount a collateral attack on a state court's judgment in the inferior Article III courts and, *a fortiori*, no mandate that state court judgments embracing questionable (or even erroneous) interpretations of the federal Consti-

tution be reviewed by the inferior Article III courts.

Collateral review of judgments accordingly is subject to legislative control, as the first Congress, dominated by those who wrote and ratified the Constitution, recognized. See *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 7 L.Ed. 650 (1830). Section 14 of Judiciary Act of 1789 prohibited any inquiry by the federal courts into the propriety of state custody. 1 Stat. 82; see *Ex parte Dorr*, 44 U.S. (3 How.) 103, 11 L.Ed. 514 (1845). Congress first created a general power of collateral review in 1867, 14 Stat. 385, and then repealed it the next year, 15 Stat. 44, a step sustained in *McCardle*. (Limited powers created in 1833, 4 Stat. 634–35, to protect federal officers from state interference, and in 1842, 5 Stat. 539–40, to protect foreign nationals, did not affect the bulk of criminal cases.) The general power was not reestablished until 1885, 23 Stat. 437, and has been subject to frequent revision by Congress—and reinterpretation by the Supreme Court—ever since. Collateral review of judgments entered after full opportunity for litigation is the work of the 20th Century. Whether the first occasion came in 1953 with *Brown v. Allen*, or that honor belongs instead to *Waley v. Johnston*, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942), or even *Frank v. Mangum*, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915), which stretched the rule that a writ may issue when the convicting court lacks "jurisdiction" (see *Ex parte Lange*, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874)), does not matter. Justices debated the question in *Wright v. West*, 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), as a matter of statutory interpretation. "Judgments about the proper scope of the writ are 'normally for Congress to make.'" *Felker*, —— U.S. at ——, 116 S.Ct. at 2340, quoting from *Lonchar*, —— U.S. at ——, 116 S.Ct. at 1298. Any suggestion that the Suspension Clause forbids every contraction of the powers bestowed by Congress in 1885, and expanded by the 1948 and 1966 amendments to § 2254, is untenable. The Suspension Clause is not a ratchet.

## II

Section 2254(d)(1) provides that a writ may not issue unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". What does this mean? Is it congruent with the judicial role established by Article III of the Constitution? And how does it affect Lindh's contentions?

### A

The Conference Report on the 1996 Act says that § 2254(d) "requires deference to the determinations of state courts that are neither 'contrary to,' nor an 'unreasonable application of,' clearly established federal law." H.R.Conf.Rep. 104–518, 104th Cong., 2d Sess. 111 (1996). This passage, together with similar comments on the floor, has led to an unproductive debate among the parties and the *amici* about what "deference" entails. It is a wonderful illustration why legislative history so often misleads—for the word "deference" does not appear in the statute. It does not tell us to "defer" to state decisions, as if the Constitution means one thing in Wisconsin and another in Indiana. Nor does it tell us to treat state courts the way we treat federal administrative agencies. Deference after the fashion of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), depends on delegation. See *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). Congress did not delegate either interpretive or executive power to the state courts. They exercise powers under their domestic law, constrained by the Constitution of the United States. "Deference" to the jurisdictions bound by those constraints is not sensible. We see no need to pursue this subject, however, because our task is to construe the enacted statute, not to construe its legislative history.

The first phrase of § 2254(d)(1)— authorizing a federal court to issue the writ when the state court's decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States", preserves rather than under-

mines federal courts' independent interpretive power. Federal courts are free to express an independent opinion on all legal issues in the case. So if, for example, the Supreme Court of Wisconsin had held that the Confrontation Clause does not entitle defendants to cross-examine witnesses to establish bias, then *Davis v. Alaska* would show that the decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States", even if decent arguments could be constructed that *Davis* misunderstood the Confrontation Clause. Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law "as determined by the Supreme Court of the United States" that prevails.

This is a retrenchment from former practice, which allowed the United States courts of appeals to rely on their own jurisprudence in addition to that of the Supreme Court. The novelty in this portion of § 2254(d)(1) is not the "contrary to" part but the reference to "Federal law, *as determined by the Supreme Court of the United States*" (emphasis added). This extends the principle of *Teague* by limiting the source of doctrine on which a federal court may rely in addressing the application for a writ. It does not, however, purport to limit the federal courts' independent interpretive authority with respect to federal questions.

■ An application for a writ is only an invitation to a federal court to grant the requested relief upon its review of a criminal conviction and confinement under state law. See *Felker*, — U.S. at —, 116 S.Ct. at 2339. The authority to issue the writ is conferred on courts by statute. *Ex parte Bollman & Swartwout, supra*. It is doctrinally distinct from the statutory grant of jurisdiction to decide a case or controversy, e.g., 28 U.S.C. § 1331. Yet just as Congress may restrict the jurisdiction of the inferior Article III courts, so it may prescribe limits on the granting of the extraordinary relief provided by the writ of habeas corpus.

A conflict between decisions of the Seventh Circuit and the Supreme Court of Wisconsin would not authorize issuance of a writ under § 2254(d)(1). State courts must knuckle under to decisions of the Supreme Court, but not of this court. So Lindh must be able to point to an authoritative decision of the Supreme Court in order to secure a writ. He has *Davis* and *Van Arsdall*. We therefore need not shoulder the potentially difficult task of determining when an appellate gloss on a decision of the Supreme Court has so far departed from its wellsprings as to be the "real" source of law, or when the chain of reasoning has stretched so long that the rule cannot be called "clearly established" as of the time the state court rendered its decision. These are the sorts of questions presented by the *Teague* standard, e.g., *Gray v. Netherland*, — U.S. —, — – —, 116 S.Ct. 2074, 2083–85, 135 L.Ed.2d 457 (1996); *Sawyer v. Smith*, 497 U.S. 227, 236, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990); *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990) ("compelled by existing precedent"), and the "clearly established" language is unlikely to pose a different kind of interpretive challenge.

The new § 2254(d)(1) adds a twist to the complexities of the *Teague* inquiry, however, because it explicitly identifies only the Supreme Court as the font of "clearly established" rules. This language could be understood to adopt an unfortunate view that applies the unitary model of the executive department to the judicial department as well. Such a view of the judiciary, which runs counter to the explicit textual differences between the vesting clauses of Articles II and III, assigns to the inferior Article III courts a role analogous to that of an executive agency. From this flawed perspective, the inferior courts are seen as agencies of the judicial department with authority derived from the power vested in the Supreme Court.

The Constitution vests the judicial power "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III § 1. The vesting clause of Article III is quite different from the vesting clause of Article II, which says that the "executive Power shall be vested in a President of the United

States of America." Art. II § 1 cl. 1. By virtue of the grant in Article II to a single person, agencies of the executive department exercise executive authority on behalf of the President. See *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

In contrast, the judicial power is given by the Constitution to each of the inferior Article III courts. Accordingly, when these courts act within their jurisdictions, they exercise the judicial power directly, though subject to the limits of revisionary jurisdiction of a court superior within the Article III hierarchy. The inferior courts do not rely on the Supreme Court for their authority to exercise the judicial power, for this power is given them directly by Article III once they are ordained, established, and provided with jurisdiction by Congress.

 Lindh would like us to stop here, to announce that § 2254(d) has not changed the law in any way material to his case, and to proceed to decision. We cannot do that, because one ingredient of Lindh's claim is not well established. The Confrontation Clause (and therefore the principles of *Davis* and *Van Arsdall*) governs at trial of the merits, but not at sentencing. Is the dispositional phase of a bifurcated trial closer to the merits, or to sentencing? We return to that question in Part II.C. Moreover, we do not read the "contrary to ..." language to authorize issuance of a writ whenever a court errs, as Lindh and the *amici* prefer; that would vitiate the second ("unreasonable application") clause of § 2254(d)(1). The two clauses have separate functions. We must ensure that the Supreme Court of Wisconsin adheres to legal principles articulated by the Supreme Court of the United States. But when the dispute lies not in the meaning of the Constitution, but in its application to a particular set of facts—when it is, in the standard phrase, a "mixed question of law and fact"—sec. 2254(d)(1) restricts the grant of collateral relief to cases in which the state's decision reflects "an unreasonable application of" the law.

The reference to an "unreasonable application of Federal law" sounds like the official-immunity question in constitutional-tort litigation, but we doubt that this is quite the right analogy. Principles of immunity are designed to draw the line between prospective relief and damages from a governmental body, on the one hand, and payment from the pocket of a public employee, on the other. Section 2254(d)(1) serves an entirely different function. Perhaps, then, the unreasonable-application language should be understood as another variation on *Teague*. Recall the quotation in *Lockhart* from *Butler*: *Teague* "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." Section 2254(d)(1) generalizes this principle of respect by withdrawing the "later decisions" proviso.

How much leeway does the "unreasonable application" language create? None on questions of interpretation. It does not authorize or permit state courts to deviate from the Constitution. Federal courts acting within their jurisdiction are always entitled to interpret the law independently. Section 2254(d)(1) as we read it does no more than regulate relief. It tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called "unreasonable." Historical practice (see Part I.D above) likewise counseled restraint in use of the writ. Other rules limiting the remedy abound. We have mentioned official immunity cases, in which federal courts retain full interpretive power, but forbear from using the remedy of damages. Consider, too, the doctrine of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), under which the exclusionary rule does not apply to evidence gathered in reasonable reliance on a search warrant, even if the warrant was issued in violation of the Constitution. In such cases the court retains (but need not exercise) the power to identify the state court's violation of the Fourth Amendment, see 468 U.S. at 925, 104 S.Ct. at 3422, but the remedy of suppression (and a new trial) is withheld unless the violation is obvious, or the officer's reliance unreasonable. The inevitable-discovery doctrine similarly specifies situations in which a constitutional violation (established by independent review in the federal courts) does not lead to

the remedy of upsetting a criminal conviction. See *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

■ None of this answers the question when a departure is so great as to be "unreasonable," for that question lacks an abstract answer, just as courts have been unable to give precise content to phrases such as "abuse of discretion." Application of *Leon* therefore has required careful inquiry one case at a time, and we do not see how application of § 2254(d)(1) can be much different. For current purposes it is enough to say that when the constitutional question is a matter of degree, rather than of concrete entitlements, a "reasonable" decision by the state court must be honored. By posing the question whether the state court's treatment was "unreasonable," § 2254(d)(1) requires federal courts to take into account the care with which the state court considered the subject.

Questions of degree—like questions about the proper use of "discretion"—lack answers to which the labels "right" and "wrong" may be attached. When the subject is painted in shades of grey, rather than in contrasting colors, a responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment. Think of the Speedy Trial Clause of the Sixth Amendment, which after *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), does not prescribe a rule for "how long is too long" but rather establishes a list of factors to consider. The Supreme Court of the United States sets the bounds of what is "reasonable"; a state decision within those limits must be respected—not because it is right, or because federal courts must abandon their independent decisionmaking, but because the grave remedy of upsetting a judgment entered by another judicial system after full litigation is reserved for grave occasions. That is the principal change effected by § 2254(d)(1).

**B**

■ The American Bar Association and a group of former federal judges, appearing as *amici curiae,* contend that § 2254(d)(1) is unconstitutional to the extent it requires any-

thing less than plenary review of all contentions based on federal law. Their argument, distinct from Lindh's invocation of the Suspension Clause, is that the "judicial Power of the United States" (Art. III § 1) is the power to interpret the law independently. They rely on *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("[i]t is emphatically the province and duty of the judicial department to say what the law is") and modern statements such as *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1447, 1453, 131 L.Ed.2d 328 (1995), and *Gutierrez de Martinez v. Lamagno,* —— U.S. ——, ——, 115 S.Ct. 2227, 2234, 132 L.Ed.2d 375 (1995).

If by this line of argument the *amici* mean that federal courts must give judgment without regard to the legal views of other public actors, and without regard to the resolution of contested issues in state litigation, then their argument reaches far beyond § 2254(d). It would mean that deference in administrative law under *Chevron* is unconstitutional; that the respect accorded to Congress when it speaks on constitutional questions (e.g., *Wisconsin v. New York City,* —— U.S. ——, —— —— ——, 116 S.Ct. 1091, 1100–01, 134 L.Ed.2d 167 (1996); *Weiss v. United States,* 510 U.S. 163, 177, 114 S.Ct. 752, 760–61, 127 L.Ed.2d 1 (1994); *Donovan v. Dewey,* 452 U.S. 594, 603, 101 S.Ct. 2534, 2540, 69 L.Ed.2d 262 (1981); *United States v. Watson,* 423 U.S. 411, 416, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976)), must be abandoned; and that the Full Faith and Credit Clause (Art. IV § 1) conflicts with Article III. This position would demolish numerous doctrines in the law of collateral attack that no one (until now) has supposed pose constitutional difficulties.

Consider *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976), which holds that when a "State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at the trial." *Stone* contemplates—indeed it requires—that a federal court re-

frain from issuing a writ under § 2254 even though the court is convinced that the state judges erred on the law, and even though the error altered the outcome of the case. On several occasions the Supreme Court has treated *Stone* as a doctrine that on grounds of prudence could be extended to other subjects (although the Court has not so extended it). See *Reed v. Farley,* 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) (claims under the Interstate Agreement on Detainers); *Withrow v. Williams,* 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (claims based on *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). If the Court could adopt *Stone* and consider extending its scope, creating a gap between the "merits" and the obligation to issue a writ, then Congress may do the same by amending § 2254.

*Teague* likewise establishes a disjunction between the meaning of the Constitution and the use of habeas corpus. If a state judgment becomes final in 1992, and the Supreme Court articulates a new rule of constitutional law in 1993, then a petition for collateral review in 1994 will fail—not because the state court was "right" on the merits, but because some errors of constitutional law do not support collateral relief. Section 2254(d)(1) codifies and extends the principle of *Teague,* and if *Teague* is consistent with Article III, then so is § 2254(d)(1) as we have construed it.

■ The *amici curiae* neglect a basic distinction that *Plaut* recognizes: Congress cannot tell courts how to decide a particular case, but it may make rules that affect classes of cases. See —— U.S. at ——-——, 115 S.Ct. at 1452–53; see also *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 441, 112 S.Ct. 1407, 1414–15, 118 L.Ed.2d 73 (1992). Congress cannot say that a court must award Jones $35,000 for being run over by a postal truck, but it may prescribe maximum damages for categories of cases, *Carter v. United States,* 982 F.2d 1141 (7th Cir. 1992), or provide that victims of torts by federal employees cannot receive punitive damages, see 28 U.S.C. § 2674. It may establish that if the driver was acting within the scope of his employment, the United States must be substituted as a party and the driver dismissed—even if that turns out to deprive the victim of compensation. See *United States v. Smith,* 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). Even for claims based on the Constitution, there may be rights without remedies. *FDIC v. Meyer,* 510 U.S. 471, 484–86, 114 S.Ct. 996, 1005–06, 127 L.Ed.2d 308 (1994); *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). So too with § 2254(d)(1). Congress lacks power to revise the meaning of the Constitution or to require federal judges to "defer" to the interpretations reached by state courts. Once the judicial power is brought to bear by the presentation of a justiciable case or controversy within a statutory grant of jurisdiction, the federal courts' independent interpretive authority cannot constitutionally be impaired. Regulating relief is a far cry from limiting the interpretive power of the courts, however, and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed.

This distinction between rights and remedies is fundamental. Every day, courts decline to disturb judgments that they *know* are wrong. This is the principal function of the law of judgments. Suppose *A* and *B* are plaintiffs in the same lawsuit, which they lose; *A* appeals and wins, while *B* does not appeal. It has now been established that the judgment against *B* is wrong. May *B* file a new suit to obtain the benefit of *A*'s victory? The answer is "no." *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). The Full Faith and Credit Clause is designed to make this result a matter of constitutional entitlement. And although today we think of claim preclusion (res judicata) as a specialty of civil law, it is only in this century that courts have treated civil and criminal judgments differently. Recall the discussion in Part I.D above. See also *Felker,* —— U.S. at ——, 116 S.Ct. at 2340; Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441, 465–99 (1963) (tracing the history).

In suits under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), courts frequently rule for the defendant even though the plaintiff may be right on the merits. Public employees receive the benefit of the doubt on legal questions and must pay damages only when the legal right has been sufficiently well established and particularized that a reasonable official would have understood that what he is doing violates that right. See *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Auriemma v. Rice,* 910 F.2d 1449 (7th Cir.1990) (en banc). Section 2254(d)(1) creates a related approach and is no less consistent with Article III. Even in criminal cases, courts sometimes enforce decisions they would not have made in the first instance. *Stone, Teague, Leon, Nix,* and the harmless-error cases, e.g., *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), are among many illustrations of the gap between having a good legal argument and winning release from custody. $X$ and $Y$ are indicted for a joint crime. $X$ pleads guilty; $Y$ pleads double jeopardy and wins, whereupon $X$ claims that his sentence is illegal and asks for relief. *United States v. Broce,* 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989), holds that $X$ must serve his sentence, because the plea of guilty waives even arguments that in retrospect are known to be correct.

Section 2254(d)(1)'s requirement that judges apply "Federal law, as determined by the Supreme Court of the United States", rather than their own understanding of the law, is consistent with the hierarchical nature of the federal judiciary. Judges of the inferior courts must implement the views of their superiors, from which it follows that many decisions of the lower courts will be inconsistent with the conclusions their judges would have reached, if unfettered by precedent. Applying, even predicting, the work of other judges, rather than reaching independent conclusions, makes up the bulk of the work of a federal judge—not only when interpreting the decisions of the Supreme Court, but also when deciding cases under the diversity jurisdiction, see *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and when coping with federal law that is not uniform geographically, see *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126–27 (7th Cir.1993); *Olcott v. Delaware Flood Co.,* 76 F.3d 1538, 1544–48 (10th Cir.1996). See also *Lehman Brothers v. Schein,* 416 U.S. 386, 390–91, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1974); Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 17A *Federal Practice and Procedure* § 4248 (2d ed. 1988), discussing a circumstance under which a state court's decision is directly binding in federal litigation: the certification of a question of law to a state court. Article III does not establish a system under which judges of the inferior federal courts always must render judgment without regard to the conclusions of other courts.

Shortly before *Brown v. Allen* changed the rules, Learned Hand could write with confidence that

upon habeas corpus a federal court does not in any sense review the decision in the state courts. Here, for example, the District Court could not properly have issued the writ, no matter how erroneous the judge had thought the state judge's conclusion that the evidence did not make out a prima facie case of the deliberate use of perjured testimony. The writ was limited to the assertion of the relator's rights under the Fourteenth Amendment; and due process of law does not mean infallible process of law. If the state courts have honestly applied the pertinent doctrines to the best of their ability, they have accorded to an accused his constitutional rights.

*Schechtman v. Foster,* 172 F.2d 339, 341 (2d Cir.1949). This expression of the longstanding distinction between unlawful *custody,* which supported a writ of habeas corpus, and unlawful *procedure* in the course of a trial, which did not, reflected the law of the United States until 1953. Congress has elected to move back in that direction—but hardly very far, preserving independent federal review on pure questions of law, and subjecting mixed questions of law and fact to review for reasonableness. We would have to cast history to the winds to say that this decision, which respects fully-litigated judgments un-

less the state court has gone seriously wrong, transgresses constitutional limitations.

■ The American Bar Association's further argument (which Lindh joins) that the Due Process Clause of the Fifth Amendment protects § 2254 from amendment is unpersuasive. The ABA contends that because federal "courts traditionally have conducted a plenary review of [state] courts' ruling[s] on legal issues", the entitlement to such a review has become a "fundamental right" protected by the substantive component of due process analysis. To establish this "traditional" role, the ABA cites no case before *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), a decision that is hardly pertinent. (*Norris* was not a collateral attack but arose on certiorari to a state court under what is now § 1257.) The summary of collateral review in Part I.D of this opinion, and Learned Hand's assessment of the state of the law in 1949, should disabuse any observer of the belief that plenary federal review of state criminal judgments is so firmly rooted in American tradition that any alteration has passed beyond legislative power. The Constitution contains an express limit on the power of Congress over the writ of habeas corpus—the Suspension Clause. It is not an appropriate exercise of the "judicial Power" to supplement the Suspension Clause with a rule that enhancements of the 20th Century cannot be altered.

### C

At last we reach Lindh's arguments about the restrictions the trial judge placed on his lawyer's cross-examination of Dr. Roberts. Lindh insists that he was entitled to cross-examine Roberts about the allegations of sexual misconduct in order to show, if not actual bias, a reason Roberts may have had to make his assessment more favorable to the prosecutor. Wisconsin replies with two arguments: first, that the decision is not "contrary to ... clearly established Federal law" because the Supreme Court has never held that witnesses during the dispositional phase of bifurcated trials are subject to cross-examination; second, that if the Confrontation Clause applies, the decision to limit cross examination was not "an unreasonable appli-

cation of" federal law, because under the Confrontation Clause "trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435.

■ Lindh rejoins that the first of these arguments is untenable because the Supreme Court of Wisconsin did not decide the case on that ground. Recall that the amended § 2254(d) begins by saying that a petition must not be granted "with respect to any claim that was adjudicated on the merits in State court proceedings" unless subsection (1) or (2) authorizes that step. Because the Supreme Court of Wisconsin addressed only the propriety of restricting the scope of cross-examination, it did not adjudicate on the merits the state's "claim" about the scope of the confrontation right. Lindh has this backwards. *Wisconsin* is not making any "claim" based on the Confrontation Clause. It is defending against Lindh's claim that the Confrontation Clause entitled him to cross-examine Roberts about the criminal investigation of the sexual-misconduct allegations. To prevail on this contention, Lindh must establish two propositions: that the Confrontation Clause applies at the dispositional phase of a bifurcated trial, and that the limitations on cross-examination were excessive. The Supreme Court of Wisconsin resolved this claim adversely to Lindh on the merits, by deciding the second proposition against him. Nothing in § 2254(d) calls on state courts to fill their opinions with discussions that by their lights are unnecessary, as the price of avoiding de novo review in federal court. There is a fundamental difference in federal practice between a "claim" and a legal theory. A "claim" is a demand for relief from an identified injury, which may be supported (or defeated) by many different theories. See *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 807–10, 108 S.Ct. 2166, 2173–75, 100 L.Ed.2d 811 (1988); *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223 (7th Cir.1993). The injury here is the restriction of cross-exami-

nation; the relief, a new trial. That claim has been resolved on the merits.

Lindh's contrary position would have especially unfortunate consequences when state law leads a state court to bypass a particular legal theory. Suppose Wisconsin decides as a matter of its domestic law to extend the right of cross-examination to sentencing. A defendant then contends that he is entitled to cross-examine a given witness to uncover bias; the state's highest court disagrees on the ground that the potential for bias is too remote to justify what might be a lengthy line of questioning. If the defendant then seeks a writ of habeas corpus, a state should be entitled to reply that there is no "clearly established Federal law" creating any right of cross-examination in non-capital sentencing—indeed, that it is clearly established that there is none, see *Williams v. Oklahoma,* 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959); *Williams v. New York,* 337 U.S. 241, 249–50, 69 S.Ct. 1079, 1084–85, 93 L.Ed. 1337 (1949); *United States v. Wise,* 976 F.2d 393, 397 (8th Cir.1992) (en banc)—and that the state court's decision therefore cannot be "contrary to ... clearly established Federal law". By Lindh's argument this response is impermissible, which could transmute a rule of state law (the extension of cross-examination to sentencing) into a rule of constitutional law, at least for purposes of that case. Yet one well established rule, not altered by the amendments, is that "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). See also, e.g., *Gilmore v. Taylor,* 508 U.S. 333, 342, 344, 113 S.Ct. 2112, 2117–18, 2119, 124 L.Ed.2d 306 (1993); *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). If the Confrontation Clause does not apply to a particular proceeding, then a mistaken restriction on the scope of cross-examination is nothing but an error of state law (which is how Justice Abrahamson's dissenting opinion approached Lindh's arguments). We therefore conclude that Wisconsin is entitled to make both of its arguments, and we turn to the first.

Starting from the premise that the Confrontation Clause is inapplicable to sentencing, Wisconsin contends that the dispositional phase of a bifurcated trial is more like sentencing than it is like the trial of the merits. At the first phase of Lindh's trial, the jury determined that he deliberately killed two people and tried to kill a third; he pleaded guilty to two other crimes. Having established all elements of the crimes beyond a reasonable doubt, Wisconsin contends, it was entitled to treat everything that followed as a matter of what should be done with the criminal—whether to imprison him (and, if so, where and for how long) or whether to "treat" him. As the state sees things, the two *Williams* cases necessarily establish that a person who provides evidence relevant only to disposition is not a "witness against" the defendant for purposes of the Confrontation Clause ("[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him").

Like questions about sentencing, the consequences of an insanity finding may be removed from the jury's purview. *Shannon v. United States,* 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994). Because "lack of mental disease" is not an element of the crimes under state law, Wisconsin was free to decide that question by a preponderance of the evidence and even to assign the burden of persuasion to the defendant. A decision that Lindh was insane at the time of the shootings would not entitle him to release; it would only change the place of his confinement. The due process clause distinguishes prisons from mental institutions, see *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), but the Court held in that case that a state could choose to hold a criminal in a mental institution using the procedures for civil rather than criminal trials. And although an insanity finding would permit Lindh to seek release if he could later establish his recovery, this is not dramatically different from the opportunity to seek release from an indeterminate penal sentence on showing "rehabilitation," a feature of the federal sentencing system until the last decade and of some state systems even today. So the state submits.

Lindh does not have a decision of the Supreme Court clearly establishing that this line of argument is mistaken. Neither does he contend that the historical practice in criminal prosecutions exposed psychiatric testimony to cross-examination for bias even if the state bifurcated its proceedings. Instead he invokes a different set of analogies. If Wisconsin had established a unitary system, in which insanity was a defense on the merits (or in which sanity was an element of the offense), then Roberts plainly would have been a "witness against" him; and if a psychiatrist would have been a witness against the defendant in a unitary trial, how can bifurcation change things?, Lindh wonders. Perhaps one could respond that a chemist testifying at trial that a certain white powder is cocaine is a witness against the defendant, but the same chemist testifying at sentencing about the same subject (to determine the quantity of the drug) is not; the contradiction is built into the Supreme Court's current jurisprudence.

■ Not prepared to concede that point, Lindh contends that *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), establishes that psychiatrists are "witnesses against" defendants even at sentencing. If that is correct, then *Specht* would "clearly establish" the lesser included proposition that defendants are entitled to cross-examine psychiatrists at the dispositional phase of a bifurcated trial. *Specht* actually stands for a different point, however: that if a state separates issues in such a way that the main trial does not establish all elements essential to imposition of the maximum punishment to which the defendant is exposed, the protections of the Confrontation Clause (and many other provisions) extend to ensuing proceedings, whether or not they are called "sentencing." Compare *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), and *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), with *Schiro v. Farley,* 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994), and *Gray v. Netherland, supra.* Specht was convicted of "indecent liberties," a crime that in Colorado carried a 10–year maximum sentence. But he was sentenced under that state's Sex Offenders Act, which allowed the judge to impose an indeterminate term of one day to life on finding that the defendant "constitutes a threat of bodily harm to members of the public, or is an habitual offender and mentally ill." The Court held in *Specht* that psychiatric testimony bearing on these issues was subject to cross-examination because it increased the maximum punishment beyond that set by law for the crime of conviction. As a practical matter, Colorado had made it a crime, punishable by life in prison, to be a mentally ill habitual sex offender. Wisconsin has not done anything of the kind. Murder is punishable by life in prison; the elements proved beyond a reasonable doubt at the first phase of Lindh's trial therefore authorize the punishment imposed on him. The dispositional phase offered Lindh the opportunity for mitigation, quite unlike proceedings under the Sex Offenders Act in Colorado.

It may well be that, when the Supreme Court finally considers the question at issue here, it will decide that all testimony bearing on the defendant's mental state, and its effect on his punishment, comes from a "witness against" the accused, and therefore must be subject to cross-examination, no matter how the state structures the trial and sentencing process. But it has not yet so held, and such a conclusion would be a nontrivial extension of current law. We think it impossible to say that "clearly established Federal law, as determined by the Supreme Court of the United States", entitled Lindh to cross-examine Roberts about the allegations of sexual misconduct with patients.

Lindh therefore has to demonstrate that the state court's decision "involved an unreasonable application of, clearly established Federal law". *Davis* and *Van Arsdall,* which demonstrate that the Confrontation Clause entitles defendants to cross-examine adverse witnesses to expose their bias to the jury, are equally clear that the proper scope of cross-examination is a matter of degree. We quoted the pertinent language of *Van Arsdall* above. The Supreme Court of Wisconsin asked the *legally* correct question by inquiring whether the trial judge abused his discretion; this is exactly how *Van Arsdall* poses the issue. And the fact-specific answer can-

not be called "unreasonable" even if it is wrong (as some members of this court who join this opinion believe). Roberts knew that prosecutors were investigating allegations made against him, but, by the time he filed his final report and testified, he also knew that the Dane County prosecutor was not in charge. He may have thought that the Milwaukee County prosecutor would reward aid to the Dane County prosecutor—but if Roberts thought that, he probably also believed that his many prior engagements as a prosecutorial expert would carry even more weight. Hindsight implies as much. The special prosecutor filed misdemeanor charges, to which Roberts pleaded guilty in January 1989. He was sentenced to probation without time in prison, and he agreed to surrender his medical license. The special prosecutor informed the sentencing judge of Roberts' many appearances as an expert witness over the course of his long career; Lindh's case was not singled out.

Nothing in the record shows that Roberts altered his views between his initial interview with Lindh (before any allegations of misconduct had come to light) and his testimony at trial. The possibility that Roberts altered his views—telling the prosecutors one thing orally at the outset of the case but offering another view, less favorable to Lindh, in the written report and on the stand—was open to unfettered cross-examination. Lindh's counsel did not need to mention the sexual misconduct allegations to explore this question in depth. Under these circumstances, a reasonable and responsible judge might conclude that cross-examination based on the allegations that Roberts had sexual relations with three female patients would divert attention from the principal issue at hand— whether Lindh had a mental disease in January 1988—without producing concrete evidence of bias. When a district judge comes to such a conclusion, a federal court of appeals will exercise deferential review, see *United States v. Hernandez*, 84 F.3d 931, 933–34 (7th Cir.1996), and will accord greater weight to thoughtfully reasoned decisions. Cf. *United States v. Beasley*, 809 F.2d 1273, 1278–79 (7th Cir.1987). *Hernandez* draws, for federal practice, a line similar to that of § 2254(d)(1): De novo appellate review for

core legal issues, such as whether the Confrontation Clause applies, and deferential review for operational decisions within areas in which the constitutional norm allows discretion. Section 2254(d)(1) requires a federal court hearing a collateral attack to accord at least that much respect to the state courts.

The opinion of the Supreme Court of Wisconsin in Lindh's case is careful; it correctly states the holdings of *Davis* and *Van Arsdall*; it does not transgress any clearly established principles; instead it addresses a matter of degree about which thoughtful people can, and do, differ. Several portions of the opinion suggest that as a matter of state law the court was holding the trial judge to an even higher standard, which it thought satisfied. Lindh believes that the state court put too much weight on objective factors (such as whether the Dane County prosecutor could reward favorable testimony) and not enough on subjective ones (such as the possibility that Roberts credited the Dane County prosecutor with more influence than he possessed, or was willing to exercise). By restricting in the new § 2254(d)(1) the scope of the extraordinary relief provided by the writ of habeas corpus, Congress has instructed the inferior federal courts to refrain from this sort of fine tuning. We hold accordingly that Lindh is not entitled to a writ of habeas corpus.

AFFIRMED.

DIANE P. WOOD, Circuit Judge, concurring in part and dissenting in part, with whom RIPPLE and ROVNER, Circuit Judges, join Part II.

This case underscores both the importance and the difficulty of the task with which courts are charged under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, in applying the new substantive standards for the issuance of writs of habeas corpus in proceedings brought by state prisoners under 28 U.S.C. § 2254. Although I concur with most of the majority's analysis of the new law, I dissent from the way it has been applied here.

## I

With one reservation, I concur in Part I of the majority's opinion, which holds that the amended version of § 2254 applies to Lindh's case. My reservation relates only to the ancillary decision to deny Lindh's motion to supplement the record in this court. See *ante*, at 867. Lindh wanted to demonstrate that the record in the Wisconsin court reflected Dr. Leigh Roberts' suspension of privileges at the University of Wisconsin Hospitals by the time of the trial. This is not an effort to introduce new evidence in any sense of that term; it is only an effort to show us what was legitimately in the record before the Wisconsin courts. In my view, in light of the changes in the law that have occurred and the lack of prejudice to all concerned, we should grant that motion.

I am also in substantial agreement with Parts II.A and II.B of the majority's opinion, which hold that the amended version of § 2254(d)(1), construed properly, does not unconstitutionally trample on the Article III powers of the federal judiciary. In particular, I agree that nothing in the language of § 2254(d) requires the federal courts to "defer" to the legal determinations of the state courts, and therefore we need not confront the serious constitutional issues that would arise if the contrary were true. I begin to part company with the majority where it foreshadows its discussion in Part II.C of its opinion and suggests that we "need not shoulder the potentially difficult task of determining when an appellate gloss on a decision of the Supreme Court has so far departed from its wellsprings as to be the 'real' source of law...." *Ante*, at 869. For better or for worse, that task will be ours in virtually every case that comes before us under the amended law, because it is rare indeed that we will see something identical in all particulars to a case already decided by the Supreme Court. However minor the factual variations, we both can and must look for guidance in our own decisions, decisions from other appellate courts (federal and state), and persuasive secondary sources.

I also disagree with the majority's statement, *ante* at 870, that one ingredient of Lindh's claim is not well established. As I explain in more detail below, the majority's description of the Wisconsin scheme is incomplete, and is therefore potentially misleading. Whether the Wisconsin court labeled this phase "dispositional" in its opinion in *State v. Koput*, 142 Wis.2d 370, 418 N.W.2d 804 (1988), is not controlling as a matter of federal law. These are questions, however, that go to the application of amended § 2254(d), not to its compatibility with Article III.

Finally, in broad terms I agree with the majority's interpretation of the key components of § 2254(d)(1) and its explanation of the difference between something "contrary to" clearly established law and something that is an "unreasonable application of" such law. My concern is with a few statements that I fear could be misunderstood. For example, the majority states broadly that the "contrary to" language of § 2254(d) does not authorize issuance of a writ whenever a court errs. If all it means by that is that doctrines like harmless error continue to apply, then the statement is a harmless truism. If it were read to imply that prejudicial errors of law can be ignored, however, it would be wrong. The statute does authorize issuance of a writ, if the state court has committed a pure error of law. This is because the federal court has the power to decide whether the state court followed clearly established law as declared by the Supreme Court of the United States and because no deference is owed to the state court's own views of that issue. The real problem is a familiar one (though no easier for being familiar): when is the issue purely one of law, and when is it a mixed question of law and fact. If the federal court concludes (*de novo*) that the state court has not made an error of law, then the question becomes whether there has been an unreasonable application of the law. This, I agree, is another way of describing the "mixed question of law and fact" situation. Unreasonableness makes sense as a standard here, if for no other reason than the deference that is owed to the state court's determination of the facts, see § 2254(e). The majority suggests that when the constitutional question is a matter of degree, rather than of concrete entitlements, the federal court

must honor a "reasonable" decision by the state court. Most constitutional entitlements in the area of criminal procedure have elements of both: if a defendant's rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), have been violated with respect to part of the prosecutor's file, it is little comfort that the prosecutor turned over other *Brady* material; the same goes for Confrontation Clause rights of the sort we have here. Just because one can cross-examine a witness about prior inconsistent statements, for example, does not mean that cross-examination is unnecessary to show that the same witness had a plea bargain with the government. Many of these rights, in short, will not be matters of degree when we address them at the proper level of detail: the deprivation will be clear, and the federal court must decide whether the right was violated.

## II

In order to explain why I disagree with the majority's resolution of Lindh's own case under the principles set forth in its opinion, it is necessary to supplement the statement of facts and the description of the procedures used in Wisconsin cases where a plea of not guilty by reason of mental disease or defect is entered.

Lindh went on his shooting rampage in the City–County Building in Madison, Wisconsin, on January 15, 1988. He himself was shot during the melee, was apprehended immediately, and was taken to the hospital under police custody. At 9:00 p.m. that evening, the district attorney's office contacted Dr. Roberts at his home and asked him to interview Lindh at the intensive care unit. Roberts agreed and promptly went to the hospital, arriving around 9:30 p.m. Lindh spoke with Roberts for some time, telling him about the circumstances preceding the murders and his feelings. Roberts elicited statements from Lindh indicating that he was not experiencing suicidal feelings, depression, hallucinations, or the like.

Lindh was arraigned in Dane County Circuit Court on February 26, 1988, and entered pleas of not guilty and not guilty by reason of mental disease. At that time, the court appointed Roberts and Dr. Frederick Fosdal, another forensic psychiatrist, to examine Lindh on behalf of the state. Shortly thereafter, Roberts learned that the University of Wisconsin Hospitals were investigating allegations that he had engaged in sexual misconduct with a female patient—allegations that he knew could lead to loss of his license and criminal penalties. In May 1988, the Medical Examining Board asked Roberts to provide it with records, revealing to Roberts that the Board, too, was concerned about these allegations.

In the meantime, Roberts continued to work on the Lindh case. On June 22, 1988, he interviewed Lindh again. The very next day, June 23, 1988, attorneys for the University of Wisconsin Hospitals referred the sexual misconduct allegations to the Dane County district attorney's office. Recognizing the potential for a conflict of interest, that office referred the case to a special prosecutor from the Milwaukee district attorney's office. Roberts learned of that appointment and of the criminal investigation on July 8, 1988. It was not until August 17, 1988, that Roberts first produced a written report on the case, which concluded that Lindh was not suffering from a mental disease or defect at the time of the shootings. On August 22, 1988, he interviewed Lindh a final time. Lindh alleges, as noted above, that the state trial court record shows that Roberts was suspended from the University Hospitals some time during the summer. Whatever the status of that allegation and his unsuccessful motion to supplement the record, it is clear that the state Medical Examining Board filed a civil complaint against him in August to take away his license, based on alleged sexual exploitation of three patients. Crucially, all these events transpired *before* the trial in Lindh's case.

On September 12, 1988, the state filed a motion *in limine* requesting that the trial court prohibit any cross-examination of Roberts concerning the allegations of misconduct pending against him or concerning any ramifications of those pending charges. Lindh opposed the motion, arguing that the circumstances raised serious questions about Roberts' bias, motive, and interest. First, Roberts would present himself as a distinguished

professional, and the jury might give less weight to his opinion if it knew that proceedings to revoke his license were pending. Second, defense counsel noted that University Hospitals had already suspended Roberts' privileges, which was important for the jury to know. Finally, Lindh argued that Roberts would have an incentive to please the prosecution, regardless of the technical fact that the particular prosecuting attorney was from Milwaukee rather than Madison. The case had received state-wide notoriety, and Roberts himself was a well-known expert witness. Unmoved by Lindh's arguments, the trial court granted the state's motion and found that evidence relating to the investigation of Roberts' misconduct was "totally irrelevant and immaterial."

When Roberts took the stand to offer his testimony, Lindh's worst fears were realized. During the initial presentation of his credentials, the jury learned that Roberts was a faculty member of the University of Wisconsin Medical School, that he was "on the adjunct faculty of the San Francisco Theological Seminary," that he had chaired conferences "in relation to religion and mental health," that about three years before he had been "honored ... as essentially the mid-west psychiatrist of the year," and, on top of all that, that he was a loving grandfather with eight grandchildren "up to nearly the age of Mr. Lindh." Because of the trial court's ruling, the jury never learned that Roberts' affiliation with the University of Wisconsin was in peril, nor that he was about to lose the prestigious standing in the profession he had enjoyed up to that time. Worst of all, the jury never learned that Roberts might have had a motive to favor the prosecution in his testimony.

As Wisconsin law requires in cases like Lindh's, there was a "continuous trial" in which the jury first considered the plea of not guilty, and, having concluded that Lindh was guilty, then considered his plea of not guilty by reason of mental disease or defect. See Wis. Stat. Ann. § 971.165(1)(a). The jury's one-sided picture of Roberts was particularly troubling because Roberts was the prosecution's star witness during the second (mental disease) stage of the proceedings.

Emphasizing his superior ability to diagnose Lindh due to the contemporaneous interview he had conducted on the date of the shooting, Roberts testified that Lindh was not suffering from any psychosis at the time of the shootings and was fully capable of understanding the wrongfulness of his actions and conforming his behavior to the requirements of the law. The defense called Dr. Ezra Griffith, who testified that Lindh suffered from a mixed personality disorder and was in a brief reactive psychosis during the shootings. According to Griffith, Lindh was unable to appreciate the wrongfulness of his actions and conform his conduct to the law when he was in such a state. Finally, the other prosecution expert, Dr. Fosdal, offered an opinion somewhere in the middle: he agreed with Griffith that Lindh was suffering from a mixed personality disorder, but he disagreed that Lindh had experienced a brief reactive psychosis during the shootings. With this evidence before it, the jury found that Lindh was able to appreciate the wrongfulness of his conduct and to conform it to the law. See Wis. Stat. Ann. § 971.15(1). In accordance with Wisconsin law, the judge therefore proceeded to the sentencing phase of the proceeding, see Wis. Stat. Ann. § 971.165(3)(a), and imposed a sentence of life in prison.

Wisconsin uses a three-phase proceeding in cases in which the mental responsibility of the defendant is at issue. A defendant is entitled to couple a plea of not guilty with a plea of not guilty by reason of mental disease or defect, pursuant to Wis. Stat. Ann. § 971.165(1). The statute establishes the order of proceedings for the two pleas as follows:

(a) There shall be a separation of the issues with a sequential order of proof in a continuous trial. The plea of not guilty shall be determined first and the plea of not guilty by reason of mental disease or defect shall be determined second.

Section 971.15(3), Wis. Stat. Ann., provides that "[m]ental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable degree of certainty by the greater weight of the credible evidence."

If the jury finds the defendant not guilty on the first plea, the court must enter a judgment of acquittal and discharge the defendant. § 971.165(1)(d). If, on the other hand, the jury finds the defendant guilty on the first plea, then the trial continues into phase two and the court withholds judgment pending the jury's determination on the second plea. *Id.* At the end of the second phase, the jury either finds that the defendant is not guilty by reason of mental disease or defect, or that the defendant is guilty (*i.e.* his affirmative defense fails). § 971.165(3). At that point, the court either enters a judgment of "not guilty by reason of mental disease or defect," or it enters a judgment of conviction. *Id.* After the appropriate judgment is entered, the court concludes the proceedings with phase three, which is either a commitment hearing pursuant to § 971.17(2)(a) or a sentencing proceeding pursuant to §§ 972.13, 972.14, and 972.15. For those found not guilty by reason of mental disease or defect, the statute requires the court to commit the person to the department of health and social services for a specified period not exceeding two-thirds of the maximum term of imprisonment that could have been imposed, unless the maximum term of imprisonment is life, in which case the commitment period can also be life. § 971.17. As soon as six months after the person is committed, he is entitled to petition for conditional release. § 971.17(4)(a). He can continue filing these petitions once every six months. Importantly, the court "shall grant the petition unless it finds by clear and convincing evidence that the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage if conditionally released." § 971.17(4)(e). A person who wins conditional release can then petition the court for termination of the order of commitment. § 971.17(5).

The Wisconsin Supreme Court discussed the predecessor statute to § 971.165 extensively in *State v. Koput,* supra, in which the principal issue was whether the jury verdict in phase two must be unanimous. It distinguished the responsibility phase of the bifurcated trial used in Wisconsin from the guilt/innocence phase, labeling it "a special proceeding in the criminal process in which the defendant has the burden of proof to establish his lack of responsibility to a reasonable certainty by the greater weight of the credible evidence." 418 N.W.2d at 805. It rejected the public defender's arguments that the usual protections for a criminal trial, such as the need for a unanimous verdict by a jury of twelve, and the requirement of proof beyond a reasonable doubt, applied in the phase two proceeding. The affirmative defense tried during phase two related only to "responsibility," and had the effect of relieving the person of the sanctions for criminal conduct. The finding of guilt during phase one, however, is unaffected by phase two. For that reason, the Wisconsin Court concluded that phase two was "dispositional" in nature and that the jury rules for phase one were inapplicable. *Id.* at 812.

In its opinion in Lindh's case, the Wisconsin Supreme Court indicated that the Confrontation Clause of the Sixth Amendment, as well as its analog in Article I, section 7 of the Wisconsin Constitution, applies to the phase two proceeding. See *State v. Lindh,* 161 Wis.2d 324, 468 N.W.2d 168, 175 (1991). On one level, that is almost enough for us, because it tells us the significance Wisconsin attaches to this stage of the proceedings. But as an independent matter of federal law, the Wisconsin Supreme Court's conclusion is plainly correct. Clearly established law from the Supreme Court shows that nothing about the phase two proceeding would justify an exemption from the Confrontation Clause.

First, Wisconsin's practice of determining criminal responsibility in the second stage of a bifurcated trial, where the defendant has the burden of proof, is no different from many other state rules that the Supreme Court has approved that similarly shift the burden of proof. See, *e.g., Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (state may require accused to prove his insanity beyond a reasonable doubt); *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (constitutional to require defendant to prove affirmative defense of extreme emotional disturbance in order to qualify for mitigating factor that reduced a charge to manslaughter); *McMil-*

*lan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (constitutional to use "preponderance of the evidence" standard for the State's burden of proof at sentencing for minimum sentencing law); *Martin v. Ohio,* 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (constitutional for Ohio to require defendant to prove affirmative defense of self-defense by a preponderance, as long as instructions required prosecution to prove all elements of the offense of aggravated murder beyond a reasonable doubt). Thus, the Wisconsin Supreme Court was on firm ground in *Koput* when it found nothing objectionable about the use of a non-unanimous jury and a shift in the burden of proof for Wisconsin's criminal responsibility determination.

Second, no matter how for purposes of state law Wisconsin wishes to characterize phase two, it is clear that it is the definitive step that yields either a finding of criminal responsibility for the offense, and hence incarceration, or a finding of no criminal responsibility, and hence hospitalization for as little as six months or as much as a lifetime. The majority disregards the provisions of Wis. Stat. Ann. § 971.17 when it asserts, *ante* at 875, that the only consequence of a decision that Lindh was not criminally responsible would be to "change the place of his confinement." The majority dismisses the possibility of release under § 971.17 as trivial, equating it to the chance of release under an indeterminate sentencing scheme. This position, however, overlooks both the critical features of the second phase of the Wisconsin proceeding and the defining characteristics of any sentencing proceeding.

It is undisputed that the second phase trial begins with a plea of "not guilty by reason of mental disease" and ends with a jury verdict of guilty or not guilty. Like all jury verdicts of guilty or not guilty, that is "dispositive" in the sense that it governs what kind of further proceedings will be required, but it is not "dispositive" in the same way a sentencing proceeding is. At the risk of stating the obvious, the purpose of a sentencing hearing is to pronounce the sentence, and the jury's phase two verdict does not even begin to address that subject. A sentence might be a fine or incarceration, or some combination of the two. It might include a period of probation or supervised release; construing the term broadly, it might even include commitment to a mental institution for a period of years. These issues are simply not before the court or the jury during the phase two trial in Wisconsin. Its sole purpose is instead to decide whether the person is criminally responsible, and hence will receive a criminal sentence, or if the person is not to be held responsible and instead is to receive involuntary commitment to a mental institution. (The latter, of course, occurs every day in contexts far removed from the criminal justice system.) The fact that the verdict of "guilty" from phase one stands does not distinguish this from many other situations— such as self-defense, heat of passion, or justification—where it is clear that the defendant committed the criminal act, but he will not be punished for it. Furthermore, the analogy to parole or release under an indeterminate sentencing scheme does not hold up. No such system of which I am aware confers an *entitlement* on the defendant to win release unless the court finds by *clear and convincing evidence* that he must remain incarcerated. Yet this is exactly how the commitment rules in Wisconsin operate for individuals found not to be criminally responsible for their acts. See Wis. Stat. Ann. § 971.17(4)(d), (5).

The Supreme Court has always required application of the Confrontation Clause to proceedings that begin with a plea of not guilty and conclude with a finding of guilt or acquittal. *Cruz v. New York,* 481 U.S. 186, 190, 107 S.Ct. 1714, 1717, 95 L.Ed.2d 162 (1987) (for purposes of the Confrontation Clause, a witness against a defendant is anyone whose testimony "is part of the body of evidence that the jury may consider in assessing his guilt."); *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923 (1965) (holding the right of confrontation applicable to the states under the Fourteenth Amendment). More than that, it has applied the Confrontation Clause to capital sentencing proceedings, where it is true that the only difference is in the nature of the sentence imposed (albeit an exceptionally important difference), explicitly recognizing

the need for adversarial debate in such a context. See generally *Gardner v. Florida*, 430 U.S. 349, 360, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) ("Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases."). The plain fact here is that Lindh could, in the words of the Wisconsin Supreme Court, have been "relieve[d] ... of the sanctions for criminal conduct" at the end of the phase two proceeding. See *Koput*, 418 N.W.2d at 812. It is no expansion of clearly established Supreme Court law to find here that stakes of this magnitude in the proceeding bring the Confrontation Clause into play, as the Wisconsin Supreme Court itself recognized.

Decisions of the Supreme Court of the United States also establish that Lindh's right to confront Roberts was impermissibly restricted, through the trial court's grant of the motion *in limine*. The two key cases, the majority agrees, are *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In the 1974 *Davis* decision, the Supreme Court began with the observation that "[c]onfrontation means more than being allowed to confront the witness physically." 415 U.S. at 315, 94 S.Ct. at 1110. The main and essential purpose of confrontation is *"to secure for the opponent the opportunity of cross-examination."* *Id.* at 315–16, 94 S.Ct. at 1110 (emphasis in original). Cross-examination involves both the testing of the witness's story and impeachment or discrediting of the witness. As the *Davis* Court said, "[a] more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* at 316, 94 S.Ct. at 1110. The Court held that counsel should have had the opportunity not only to ask the witness in question whether he was biased, but also to explore why he might have been biased or otherwise lacked impartiality.

The Court reiterated all these points in *Van Arsdall*. Notably for Lindh's case, it drew a distinction between trial court control of cross-examination to limit harassment, confusion, repetition, or the marginally relevant, and the prohibition of *all* inquiry into the possibility of a witness's bias. 475 U.S. at 679, 106 S.Ct. at 1435. It held that:

a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." 475 U.S. at 680, 106 S.Ct. at 1436, quoting from *Davis v. Alaska*.

The particular risk of bias in *Van Arsdall* was quite similar to the type Lindh wished to put before the jury. The trial court in *Van Arsdall* prohibited inquiry into the terms of an agreement the witness had made with the prosecutor to drop a drunk driving charge in exchange for his testimony about the murder. There was nothing unusual or unprecedented in Lindh's effort to show that Roberts, too, might have been shading his testimony with the ulterior motive of securing better treatment from the state. Thus, Supreme Court decisions establish both that the Confrontation Clause applies to the kind of proceeding we have here, and that the Confrontation Clause is violated when the defendant is precluded from exposing "possible biases, prejudices, or ulterior motives." *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110.

The only question remaining is whether the Confrontation Clause was violated here, when the trial court precluded all inquiry into the proceedings at which Roberts risked loss of his professional license, obloquy from his peers, and criminal conviction. Both the Wisconsin Supreme Court and the majority here believe that the administrative transfer of the case from the Dane County prosecutor's office to the Milwaukee special prosecutor erased all possibility of concern from Roberts' mind. In my view, this asked the wrong question (*i.e.* was it sufficient when

steps were taken to assure formal insulation of the Milwaukee prosecutor from the Dane County office), and thus produced the wrong answer. The focus must instead be on Roberts' motivations to shade his testimony, just as it was in *Van Arsdall*. It is worth recalling what had already happened to Roberts, before deciding whether the trial court erred in its total exclusion of the impeachment testimony. The two critical dates are July 8, 1988, and August 17, 1988. No later than July 8, 1988, Roberts knew that a criminal investigation of his activities was underway, with all that implied for his career. Yet it was not until August 17, 1988, as far as this record shows, that he first reduced his conclusions about Lindh to writing. The majority comments that there is no reason to believe Roberts changed his mind between the initial interview on the date of the shooting and August 17, but there is obviously no way to know if the trial court forbade inquiry and cross-examination on the matter. (The majority suggests that Roberts was open to "unfettered cross-examination" on this issue, but that cannot be true given the fact that Lindh's counsel was forbidden to question Roberts on the one fact that might have led Roberts to change his mind: his legal problems, and his hope of winning favorable treatment from the prosecutors.) By the time the trial started, the state Medical Examining Board had also filed a civil complaint against Roberts to take away his license. Again, the jury knew nothing of this; instead, it was informed that he was "mid-west psychiatrist of the year."

Cross-examination on Roberts' legal difficulties was required for at least two reasons. First, when expert witnesses are proffered the jury is entitled to learn about their qualifications. See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Particularly in a field like psychiatry, where methodologies are not readily subject to the kind of objective scientific verification the Supreme Court called for in *Daubert*, the jury is entitled to evidence that will suggest what weight it should give to the expert's opinions. It is fanciful to assume that a jury would give the same weight to the "mid-west psychiatrist of the year" as it would give to someone who

was facing both criminal charges and civil proceedings to revoke his license. Second, as Justice Abrahamson of the Wisconsin Supreme Court so ably demonstrated in her dissenting opinion, Roberts subjectively may have believed or hoped that a "good performance" on his part for the state might cause the prosecutor to treat him leniently. The fact that the prosecutor was called a "special prosecutor" for Dane County, rather than a member of the usual staff, cannot have made any difference from Roberts' subjective viewpoint. The courts regularly see witnesses in criminal trials who face charges in multiple jurisdictions (federal and state, or several states or parts of states), and the witnesses are aware that their performance is being watched by all concerned. If a witness were testifying in a case before the Circuit Court of DuPage County, Illinois, and that witness were facing charges in Cook County, the State's Attorney would have no ground for keeping out cross-examination designed to show hope of favorable treatment at the hands of the Cook County authorities. Roberts' case is no different.

Indeed, the case is even stronger for finding that Roberts may have entertained such a hope. Not all criminal prosecutions—not even all murder prosecutions—receive statewide publicity, but the Lindh case did. Roberts, who had testified by his own account all over the state, knew that he was known in Milwaukee, just as he was known in other parts of Wisconsin. He had every reason to begin his efforts for leniency on the witness stand in Lindh's case. (Although it is not relevant to the trial court's ruling on the motion *in limine* here, the record of the actual criminal sentencing that took place after Roberts was convicted on the charges shows that his expectations were well founded. Both the prosecutor and the judge expressed intense regret at having to sentence him to anything at all, given his outstanding service to the state over many years.)

*Van Arsdall* and *Davis* make clear that the trial court did not face an "all or nothing" option with respect to the proffered impeachment testimony. It was entitled to place reasonable limits on it, to avoid having the jury distracted with Roberts' problems. The

trial court could, for example, have permitted cross-examination about the existence of the pending charges and forbidden discussion of their basis, instructing the jury that the nature of the professional misconduct charges was not relevant. This, or other possible limitations, would have eliminated or minimized any risk of a salacious exploration of Roberts' sexual proclivities. The problem here, as in *Van Arsdall,* lay in the total exclusion of the evidence. It is impossible, given the absence of scientific validation of this kind of psychiatric diagnosis, to say that this error was harmless. The jury literally had to decide whose word it would accept: Roberts', Fosdal's, or Griffith's. We must recall that *only* Roberts testified both that Lindh had no personality disorder and that he was responsible at the time of the offense. The jury would have seen an entirely different picture if Roberts had been discredited, and it was left only with Fosdal, who agreed that Lindh had a personality disorder but who thought he was responsible at the time, and Griffith, who thought Lindh had the disorder and was not responsible for what he did. Lindh, recall, had only to persuade the jury by a preponderance of the evidence that he was suffering from a mental disease or defect and could not conform his actions to the law.

In my view, the adjudication of Lindh's claim in the Wisconsin courts resulted, in the words of § 2254(d)(1), in a decision that was contrary to clearly established federal law as determined by the Supreme Court of the United States. To the extent it might better be characterized as a mixed question of law and fact, the Wisconsin decision was an unreasonable application of clearly established federal law. For the reasons I have explained, I would grant the writ of habeas corpus.

RIPPLE, Circuit Judge, with whom ROVNER, Circuit Judge, joins, dissenting.*

This case presents several issues involving the new amendments to section 2254 of the Judicial Code. Among those issues, the one of most enduring importance is whether the new section 2254(d) is compatible with the judicial role of the United States courts required by the Third Article of the Constitution. The problematic subsection, identified as such by the President in his approval of the legislation[1] and by legislators who favored and opposed the measure, forbids the issuance of a writ of habeas corpus unless the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

1.

Several rules of statutory construction are pertinent to our analysis. First, we must remember that the statute must be interpreted as a whole. The amended language therefore must be considered in relation to the unamended language. We must give every word of the statute a meaning. We cannot assume that Congress intended certain words or phrases to have no force and effect. *See Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988). We also must attempt to interpret the statute in a manner that renders it constitutional. *See Johnson v. Robison,* 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165–66, 39 L.Ed.2d 389 (1974). In doing so, however, we must not give the statute a strained meaning that clearly was not the intent of Congress. *See, e.g., Seminole Tribe of Florida v. Florida,* —— U.S. ——, —— n. 9, 116 S.Ct. 1114, 1124 n. 9, 134 L.Ed.2d 252 (1996).

We turn briefly to another preliminary consideration. The text of the amended statute sets forth what can be characterized semantically as two separate requirements: (1) that the underlying state decision be contrary to or involve an unreasonable application of federal constitutional law; and (2) that the applicable federal constitutional law have been determined by the Supreme Court of the United States. Ease of presentation and discussion certainly suggests such a divi-

---

\* Judge Ripple also joins Part II of Judge Wood's dissenting opinion.

1. Statement of the President of the United States Upon Signing the Antiterrorism Bill, April 29, 1996, 1996 WL 203049 (White House).

sion and the majority adopts it as its analysis. In the paragraphs that follow, the same pattern will be followed as a preliminary matter. However, we must also remember that the structure of our analysis can, and indeed often does, predetermine the result. This two-pronged approach, helpful as it is in the presentation of the material, must be critically evaluated because, although it has the virtue of clarity, it may well not reveal the true operation and effect of the statute and therefore present a skewed model for final evaluation of the amendment's constitutionality.

Finally, it is important to note that, both before and after the amendment in question, the fundamental task of the judiciary under this statute remains unchanged: Congress has given the federal courts, including this court, the task of determining whether a state prisoner is "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254. Under the previous version of the statute, the federal court determined on its own the applicable federal constitutional standard. The new statute operates in a decidedly different manner. Having given the federal courts the jurisdiction to determine whether a person is being held in custody in violation of the Constitution and laws of the United States, Congress now has also mandated how the courts will determine the applicable constitutional standard.

### 2.

Under the new amendment, in ascertaining whether there has been a violation of the Constitution, the courts are restricted to the case law of the Supreme Court of the United States; they are not permitted to rely as well upon their own precedent. In short, Congress, although continuing to vest the federal courts with the authority to decide whether a person is being held in state custody in violation of the Constitution, has now specified that the judiciary is required to disregard the work product of one of its components, a source of law upon which the courts otherwise would rely in the adjudication of the case.

It is a "basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected ... as a permanent and indispensable feature of our constitutional system." *Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958). As *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), made clear in the earliest days of the Republic, this obligation flows from the constitutionally imposed obligation of the courts to decide cases within their jurisdiction and to determine and apply the law necessary to adjudicate those cases.

In determining whether Congress has intruded impermissibly into the federal judicial function, we must, as the majority acknowledges, first determine, with specificity, the nature of the judicial power. There can be no disagreement with the basic proposition that the Constitution, in its very text, makes clear that, once created, the inferior federal courts share the judicial power with the "one Supreme Court" mentioned explicitly in the constitutional text. Nor can there be any disagreement that such power must be exercised in light of the "revisionary" jurisdiction of the Supreme Court. Beyond this point, however, it is difficult to determine the precise contours of the majority's concept of the federal judicial power. Despite its emphasis on the distinctive responsibility of an inferior court, it describes the role of that inferior court as simply placing a "gloss" on the work of the Supreme Court. If we are to understand the constitutional function that we are duty bound to protect, a far more carefully drawn description of its contours is indicated. It helps little to define it in the negative; it is obviously not the "agency relationship" that exists between the Chief Executive and the executive departments of the government.

The relationship and interreaction of the various levels of the judiciary in molding constitutional doctrine is the product of a carefully crafted balance of power between the judiciary and the legislative branch. That balance of power is constitutionally based. Through its control of the appellate jurisdiction of the Supreme Court and the entire jurisdiction of the lower courts,

Congress certainly can influence the development of the constitutional doctrine. However, just as there are limits on the constitutional authority of the judicial branch, so too there are limits on the power of Congress to dictate the process of decision-making within the judicial department with respect to the meaning of the Constitution. Although Congress has the authority to create and abolish the lower federal courts and to regulate their jurisdiction, it has no power to dictate how the content of the governing law will be determined within the judicial department. In the present jurisdictional structure ordained by Congress, it is the responsibility of the Supreme Court of the United States to regulate, principally through the doctrines of stare decisis and precedent, the jurisprudence of the lower federal courts. Control of the law making function of the lower federal courts, within the hierarchical nature of the judiciary, is therefore a matter within the province of the Supreme Court. The Supreme Court of the United States, with the authority to bring a court of appeals to doctrinal heal, determines the degree to which the lower courts ought to be permitted to engage in constitutional doctrinal development.

When a case comes before an inferior federal court in the normal course of its exercise of jurisdiction, it is the duty of that court to determine the constitutional question before it. The inferior courts have a clear responsibility to refine the basic constitutional principles enunciated by the Supreme Court. The task is accomplished through the process of reasoned elaboration disciplined by the doctrines of stare decisis and precedent. The duty "to say what the law is" is a unitary one within the unitary judicial department created by the Constitution. *See Plaut v. Spendthrift Farm,* —— U.S. ——, ——, 115 S.Ct. 1447, 1457, 131 L.Ed.2d 328 (1995) ("not a batch of unconnected courts, but a judicial *department* composed of 'inferior Courts' and 'one Supreme Court' ") (emphasis in original). In performing that function, an inferior federal court is not free to determine the content of the Constitution without reference to the existing jurisprudence of the Supreme Court of

the United States. It must decide the case, but it must decide it as it believes, after study of and reflection upon existing case law, the Supreme Court of the United States would decide it under the Constitution. *See Levine v. Heffernan,* 864 F.2d 457, 459 (7th Cir.1988), *cert. denied,* 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989). The Supreme Court then determines, in due course, whether the doctrinal development will be short-lived or remain a long-term part of the fabric of the constitutional jurisprudence of the judicial department of government. One justice described the interrelationship of the work of the inferior and Supreme Court by explaining the Supreme Court's scrutiny of the work of the lower courts in these terms: "Across the screen each Term come the worries and concerns of the American people—high and low—presented in concrete, tangible form." *Tidewater Oil Co. v. United States,* 409 U.S. 151, 175, 93 S.Ct. 408, 422, 34 L.Ed.2d 375 (1972) (Douglas, J., dissenting). The longevity of our constitutional jurisprudence is a matter that Congress can control only through the initiation of the amendatory process or through the alteration of the jurisdictional scheme. Congress otherwise has no more right than we to determine those aspects of our jurisprudence that the Supreme Court will allow to endure.

In section 2254, Congress has given the district court the task of determining whether a person is being held in violation of the Constitution. To require the federal judiciary to hold that there is no constitutional violation simply because there is no case of the Supreme Court of the United States directly on point, is to deny it the right to refer to the corpus of jurisprudence to which it turns when it must "say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *see also Wright v. West,* 505 U.S. 277, 305, 112 S.Ct. 2482, 2497, 120 L.Ed.2d 225 (1992) ("We have always held that federal courts, even on habeas, have an independent obligation to say what the law is.") (O'Connor, J., concurring). The amended statute requires that we decide whether a person is in custody in violation of the Constitution without consulting the body

of law that determines what the judicial department says the Constitution requires.[2]

### 3.

Limiting the judicial function of determining the meaning of the Constitution to a scrutiny of the decisions of the Supreme Court is, in itself, a sufficient constitutional infirmity to vitiate the amended statute. An examination of the "second requirement," independent of the first, raises, however, substantial additional concerns about the amendment's effect on the constitutional integrity of the Third Branch.

The amended statute requires that, although the district court has the obligation under the statute to issue the writ when the person is held in violation of the federal Constitution, the court must accept as definitive an interpretation of the federal Constitution by the state court, if that interpretation is a reasonable view of the clear precedent of the Supreme Court. Assuming arguendo that a reference only to the clear precedent of the Supreme Court is constitutionally acceptable, even the decisions of the Supreme Court do not form the substantive rule of decision in granting or denying the writ unless the state court's decision is deemed unreasonable. Even if the Supreme Court's rendition of the Constitution is "clearly established," it becomes the rule of decision only if the state court's interpretation of the federal Constitution is deemed to be very different from that of the Supreme Court of the United States. Otherwise, the state's view of the Constitution, not the Supreme Court's view, is operative.

Cast in its best light, this argument, at bottom, characterizes the restriction contained in the amendment as one of remedy: Congress simply has determined that the writ is to be available to state prisoners only when the state court's departure from the federal norm had been "unreasonable." Habeas relief is to be limited to those instances in which the degree of departure from the federal standard is so great as to have worked a gross deprivation of federal protection. This argument can be best evaluated by examining the support that the majority offers for this characterization. In its attempt to justify this approach, the majority points to other instances in which, despite the existence of a constitutional violation, plenary relief may not be available to an aggrieved individual. At first glance, these instances present seductive analogues to the present situation. Upon closer scrutiny, however, it is clear that in none of these instances is the federal court deprived of its essential responsibility and prerogative to define the meaning of the federal Constitution and to apply it to the case before it. Therefore these superficial comparisons provide no support for the statute under review in the present case.

There are several instances in which federal courts, although both declaring and applying the Constitution of the United States, place significant limitations on the available remedy. For example, in adjudicating a civil rights matter under section 1983, a federal court determines the applicable federal constitutional rule and applies it to the case before it. Its view, not the view of any other sovereign, determines the applicable constitutional standard. Nevertheless, if a violation of a substantive constitutional standard is identified, the available remedy will vary depending on the circumstances.[3] So too, in

---

2. The majority appears to sense the incongruity of its position when it seemingly acknowledges that such an intrusion into the federal judiciary's adjudicative function would not be permissible in the regular case or controversy but is acceptable in the case of habeas corpus. For the majority, a habeas corpus proceeding is somehow less of a constitutional case or controversy properly within the jurisdiction of the federal courts. Although this distinction is apparently crucial to its holding, the majority never discloses how or why the habeas jurisdiction of the federal courts somehow is different than other areas of the courts' jurisdiction. Although it is very clear

that the Congress, having once enacted a cause of action and vested a tribunal with the authority to adjudicate cases arising under it, can no longer dictate the rule of decision for the resolution of cases under it, we are told—as a matter of ipse dixit—that the situation is different with habeas.

3. For instance, although a state official's conduct may be determined to have violated a prevailing constitutional standard, the official may be held to enjoy absolute immunity, see *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (holding that a judge enjoys absolute immunity for judicial acts within his jurisdic-

our Fourth Amendment jurisprudence, the legality of the search always remains a matter of federal constitutional law, although the remedy of the exclusionary rule is inapplicable when the law enforcement officer reasonably relied upon a judicially issued search warrant. See *United States v. Leon*, 468 U.S. 897, 925, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984).

In the area of habeas corpus, the same pattern is evident. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), simply holds that violations of the Fourth Amendment are not cognizable on habeas review because the violation does not affect the truth-finding process that is the principal focus of habeas relief. There is no deprivation of either the law declaring function or the adjudicatory function of the federal courts. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), likewise leaves intact the essential functions of the adjudicatory process. The case is adjudicated by the federal court on the basis of federal law. The rules of retroactive application of new developments are adjusted to take into account the nature of habeas relief.[4] It is not accurate, therefore, to term this amendment a mere extension of the principle of *Teague*. There is a qualitative difference—a constitutional difference—between fixing the time frame at which federal law will be applied and requiring that the federal court defer to any application of constitutional principle that cannot be characterized as unreasonable. Under the latter approach, mandated by the amended statute, the federal court must be content with a careful application of the Constitution, even if it is wrong. In essence, the federal court is free to have its own opinion of what federal law requires, but it must grant or deny the writ on the basis of another non-federal tribunal's view. Federal courts, however, must not merely expound on the cases before them; they must decide them. *Plaut*, —— U.S. at ——, 115 S.Ct. at 1453. The judicial power is the

authority, and the obligation, to adjudicate the case. Adjudication involves more than just the opportunity to declare the content and meaning of the law; it also involves the authority to apply that law as well.

4.

The magnitude of the deprivation worked on the judicial function can best be appreciated, however, by assessing the impact of the two phrases of the amendment together. Under the new scheme, the only permissible reference to federal constitutional law is to clearly established Supreme Court precedent. That precedent becomes the rule of decision with respect to the issuance of the writ only if the state court reaches an unreasonable view. When we pause to reflect on the role of the Supreme Court of the United States in constitutional adjudication and on the majority's view as to how reasonableness is to be measured, it becomes clear that any suggestion that a federal rule of decision will be applied to adjudications under section 2254 is illusory.

First, it must be remembered that it has never been the role of the Supreme Court of the United States to micro-manage the development of federal constitutional jurisprudence. From the days of the Great Chief Justice in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1818)—"[W]e must never forget that it is *a constitution* we are expounding"—to Congress' ratification of that role in the latest reassessment of the certiorari statute, see 28 U.S.C. § 1254 (1994), the Supreme Court's function has been to set, at a significantly broad level of generality, the guiding principles of our constitutional jurisprudence. Further application of those principles has been the work of the lower federal courts under the scrutiny of the Supreme Court.

In state criminal proceedings, these general principles must be applied, in the first instance, by the state courts. *See* U.S. Const. Art. VI. On habeas review, the ma-

---

tion), or qualified immunity, *see Malley v. Briggs*, 475 U.S. 335, 340, 106 S.Ct. 1092, 1095–96, 89 L.Ed.2d 271 (1986) (stating that qualified immunity for executive officials—state or federal—is the norm), from a damages remedy, although not from a prospective equitable remedy.

4. *Teague*, 489 U.S. at 309, 109 S.Ct. at 1074 (noting that in the habeas review context, "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system").

jority holds that it is not simply a matter of the lower federal court's giving respectful heed to the interpretation of the federal constitution rendered by the state court. Rather, the lower federal court must accept as the federal rule of decision the state court's view as preferable to its own. Moreover, given the broad level of generality at which the Supreme Court usually articulates the general principles of constitutional criminal procedure, the difference between the views of the federal and state court may indeed be substantial. Nevertheless, the majority tells us that these issues are "[q]uestions of degree" and that a reasonable decision of the state court must be honored. "Questions of degree" are subjects "painted in shades of grey, rather than in contrasting colors...." This statement stands in stark contrast to the Supreme Court's own description of "contrasting colors" in *Estin v. Estin*, 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948): "there are few areas of the law in black and white. The greys are dominant and even between them the shades are innumerable. For the eternal problem of the law is one of making accommodation between conflicting interests." The majority requires deference on all questions of degree. Yet, as the Supreme Court itself reminded us in *Estin*, discerning among the shades of grey is the essence of the adjudicatory function. *See Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985) ("But, as we now reaffirm, the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination."). By suggesting that the amendment deprives the federal district court of responsibility for all questions of degree, the majority points graphically to why the amendment does not leave intact the integrity of the Third Branch: it deprives the federal court not only of its prerogative to determine the content of federal law, but also of its right and duty to apply that law to the case before it.

As the Supreme Court has reaffirmed "time and again," the Constitution assigns to each of the three coordinate branches their own responsibilities and vests in each their own powers. *Morrison v. Olson*, 487 U.S. 654, 693, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988). And although the Supreme Court has rejected the formalist view that there is to be no "control or coercive influence,"[5] exerted by one branch over another, if one branch, through its actions, "unduly interfere[s]" with the role of another, such actions are void. *Morrison*, 487 U.S. at 693, 108 S.Ct. at 2620. In making this determination of "whether an Act [of Congress] disrupts the proper balance between the coordinate branches," we are to focus "on the extent to which it prevents ... [another] Branch from accomplishing its constitutionally assigned functions." *Nixon*, 433 U.S. at 443, 97 S.Ct. at 2790. The amended statute significantly "interfere[s]" with the judicial role and to a great extent prevents the judicial department from accomplishing its "constitutionally assigned functions." Simply put, the statute, as amended, deprives a federal court of the right to adjudicate the case. And a court that does not adjudicate advises: a role decidedly different than the one the Constitution envisions for courts and judges of the Third Article.

**5.** *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 441–42, 97 S.Ct. 2777, 2789, 53 L.Ed.2d 867 (1977) (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935)).